GANDY, et al. *v.* PALMER

No. 43235          December 14, 1964          169 So. 2d 819

*Edward J. Currie,* Hattiesburg, for appellants.

*Rex K. Jones,* Hattiesburg, for appellee.

BRADY, TOM P., J.

This is an appeal from a malicious prosecution suit, filed in the Circuit Court of Forrest County, Mississippi, by appellee, Robert Palmer, against the defendants, James L. McCaffrey, Sr., Delbert Gandy, James L. McCaffrey, Sr., d/b/a McCaffrey's Homelite Chain Saw Agency, and McCaffrey's Real Estate and Insurance Agency, Incorporated, a corporation. The plaintiff below, appellee here, sought to recover damages against said defendants below, appellants here, for the malicious issuance of a criminal affidavit charging the plaintiff with the commission of a crime under Mississippi Code Annotated section 2153 (1956), commonly known as the "Bad Check Law." From a judgment in favor of Robert Palmer, appellee, the appellants, McCaffrey's Real Estate and Insurance Agency, Inc., a corporation, and Delbert Gandy take this appeal. The judgment was for the sum of $10,000. Stating the prolix and disputed facts in this case as laconically as possible we find that during the month of February 1962 one H. D. Lumpkin purchased from James L. McCaffrey, Sr., d/b/a McCaffrey's Homelite Chain Saw Agency, which was owned and operated individually by James L. McCaffrey, Sr., hereinafter called James L. McCaffrey, Sr., d/b/a Agency, a saw. H. D. Lumpkin executed a note for the purchase price of the saw. On February 13, 1962, the appellant McCaffrey's Real Estate and Insurance Agency, Inc., a corporation, hereinafter called McCaffrey's Inc., purchased from J. L. McCaffrey, Sr., d/b/a Agency, H. D. Lumpkin's note. On or about May 12, 1962, H. D. Lumpkin in turn sold his equity in the saw to appellee Palmer, who assumed payment of the balance due on the saw in the sum of $52.31. Subsequent to purchasing the saw from H. D. Lumpkin, appellee Palmer made one payment of $10, leaving a balance due and owing of $42.31 to McCaffrey's Inc. On September 26, 1962, appellee Palmer was issued a check made by one Edwin Lennep,

doing business as Edwin Lennep Lumber Company, in payment for logs which appellee Palmer had sold to Edwin Lennep. The check was in the sum of $94.58 and was drawn on the Merchants & Marine Bank of Moss Point, Mississippi. The appellee carried the check in his pocket for a period of nine days.

Mrs. Ruth Ingram was the manager and vice-president of McCaffrey's, Inc. Mrs. Ingram was in charge of real estate and loans. The record discloses that she had the authority to hire and fire persons employed by McCaffrey's Inc., and the record also indicates that she had employed appellant Gandy as an outside collector on a mileage and percentage basis.

On October 5, 1962, appellee Palmer and his wife came to McCaffrey's, Inc., and advised the manager, Mrs. Ruth Ingram, that he wanted to pay off the saw note which he had assumed from Mr. Lumpkin. Appellee Palmer presented to Mrs. Ingram the check for $94.58, dated September 26, 1962, made by Edwin Lennep payable to the appellee. The appellee endorsed the check and the record discloses that he then requested that Mrs. Ingram ascertain whether or not the check was good. This is disputed by Mrs. Ingram who says that she did not have the cash in her office and had to go to a back office to obtain sufficient cash, while appellee says that she went to the back office in order to determine whether or not the check was good. Whether she did or did not advise appellee upon her return that the check was good, she nevertheless cashed the check and credited the appellee with $42.31, the balance due and owing on the Lumpkin note. The balance of $52.27 cash was delivered to the appellee. The record discloses that the check was then presented to the Merchants & Marine Bank of Moss Point, Mississippi, and that the check was dishonored by the bank because of insufficient funds and was returned to McCaffrey's, Inc., marked unpaid because of this fact.

Mrs. Ruth Ingram thereupon instructed Delbert Gandy to advise the appellee that the check had not been accepted and to collect the $94.58 from the appellee. The record disclosed that Delbert Gandy was not a regular employee, agent, representative or servant of the defendant, but was what was called an "outside collector" for McCaffrey's, Inc. When making authorized collections for the appellant, McCaffrey's, Inc., Delbert Gandy was paid ten percent on such amounts as he might collect, plus a mileage allowance. Mrs. Ingram advises that on October 5, when the check was referred to Mr. Gandy for collection, this was the only check that McCaffrey's, Inc., had assigned to him at that time for collection. The record discloses that appellant Gandy made two or more trips to the home of appellee Palmer, but that he saw him only once. The testimony is in sharp conflict as to what transpired and what conversation took place between appellant Gandy and appellee Palmer. A letter was written by Mrs. Ruth Ingram to appellee Palmer informing him that the check which he had delivered to her had been returned by the bank upon which it was drawn. Delbert Gandy, on his second attempt some five or six days later, saw appellee Palmer in the town of Brooklyn. Appellant Gandy testified that he told appellee that they would have to have their money and for him to borrow the money or get the money. He told him to see Mr. Lennep and get him to make the check good; that his employer was in a bad position and that she was going to have to pay the money herself if the appellee didn't take care of it. On the other hand, the appellee asserts that the appellant Gandy told him if they had to get the law they would "bypass you and go direct to Mr. Lennep. He says, we've got ways of getting our money." Appellant denies this. Appellee Palmer further testified that he saw Mr. Lennup, who told him that he would get the money for him, and to tell appellants to present the check again.

Appellee Palmer testified further that he advised Mr. Lennep that the appellant Gandy had threatened to have the law on him and that Lennep laughed and said, "Well, I'll get his money on up there to him." The record discloses that the check was again presented and was again turned down by the Merchants & Marine Bank of Moss Point. The appellee claims that he again went to see Mr. Lennep, accompanied by Mr. Cameron and Mr. Hoyt Simmons; that he told Mr. Lennep appellants wanted their money and that he had better get it up to them, and that Mr. Lennep said, "I'll get it up there," and that appellee never saw Mr. Lennep subsequent to that time. Mr. Lennep, however, testified that appellee Palmer came down to see him and told him he was going to have to get the money for the check; that Mrs. Ruth Ingram would return the check to him, and that he persuaded Mr. Lennep to pay him the $94.58, which he did while they were at his millsite, and in the presence and view of two Negro employees, Joe Louis Anderson and Willie Betts, who corroborated this statement. This is denied by appellee Palmer. Mrs. Ingram, on December 15, turned the check over to appellant Gandy; this was two months and ten days subsequent to the time the check was first presented for payment on October 5, and the record discloses that appellant, Gandy, acting under instructions of manager, Mrs. Ruth Ingram, went to the office of the Justice of the Peace, R. C. Bradley, in Hattiesburg, Mississippi, and attempted to have Justice Bradley prepare an affidavit against appellee for the issuing of a worthless check. The record shows that Justice Bradley declined to do so but recommended to appellant Gandy that he go and discuss this matter with County Attorney Joe R. King. This appellant Gandy did. Appellant Gandy testified that County Attorney King told him to go to R. C. Bradley and make out an affidavit under the "Bad Check Law" against the appellee. Mr. King, on cross-examination, said his recol-

lection was hazy about the events, but that he had no knowledge of so advising appellant Gandy and that appellant Gandy's acts were not done on his advise. The record discloses that appellant Gandy went back and reported to Justice of the Peace Bradley that he had a conversation with County Attorney King and that Mr. King had advised him to make an affidavit against appellee Palmer under the ''Bad Check Law.'' Justice Bradley prepared an affidavit under sections 2153 and 2154, utilizing the prepared form set out in Mississippi Code Annotated section 2154 (1956), commonly referred to as the ''Bad Check Law.'' The record discloses that sometime later appellant Gandy called the sheriff's office, talked to Chief Deputy Childress and asked him what had been done about the affidavit which had been made out against the appellee. Childress advised that Deputy Sheriff Willie Oubre was going to serve the affidavit or warrant on appellee Palmer that afternoon. Deputy Sheriff Oubre testified that Justice Bradley ''got'' the affidavit and warrant over to his office, and about two weeks later he took the affidavit and warrant and went to appellee Palmer's home. He did not recall the date. Deputy Sheriff Oubre said he talked with appellee and asked him if he would come to the jail, if it would be convenient for him to do so that night. Oubre suggested that he bring two signers for his bond to the jail and that he would meet them there; that he had two other places that he needed to go in the area, and the time for meeting was set at eight or eight-thirty. Oubre further testified that when he arrived at the jail, he found that appellee Palmer was already in the jail, with his two sureties for his bond, waiting for him in the lobby. The deputy sheriff wrote out the bond and the two sureties signed it, as did the appellee who was then released. The deputy sheriff testified that he did not take Palmer into physical custody. He testified that technically there was an arrest, but physically he did not

take him into his custody nor physically take him into jail; that he did not put him in jail as a prisoner; that he was only in the lobby of the jail where he was "booked", and there the appellee Palmer paid a dollar for booking fee, and that he was immediately released after executing the bond and paying the dollar.

Subsequent to leaving the Forrest County jail, the appellee Robert Palmer went to the Justice of the Peace Bradley and asked him what he should do about it and testified that Bradley advised him to pay off the indebtedness. Appellee Palmer then went to the district attorney who advised him, after discussing the matter with him, that he had not committed a crime. The record discloses that nothing further was done by appellants subsequent to the filing of the affidavit with Justice of the Peace Bradley. It appears that no preliminary hearing was held before the justice of the peace for the appellee, nor did the appellant Delbert Gandy go before the grand jury, nor did the grand jury indict the appellee. It appears that several grand juries have convened subsequent to the filing of the suit at bar and that nothing has been done by any of them with reference to indicting the appellee. As proof of damages sustained by appellee, the record shows that four or five of his associates, companions and friends referred to him as being a jailbird, and that his boy Jimmie had heard some of his classmates at school say that his father was a jailbird. Insofar as actual financial losses are concerned, there is no testimony other than that of the appellee, who testified that prior to the time of his alleged arrest he was making $150 to $200 per week, and that subsequent thereto he has made only $75 per week, because no one will sell him timber. The proof, however, shows that he was salvaging sunken logs out of swamps and creeks, and the record wholly fails to show that he endeavored to purchase any standing timber from anyone. The names of no timber owners were

given who had declined to sell him timber, nor were the names of any timber owners given who had, prior to his arrest, ever sold him any timber. The record does not indicate any additional specific financial losses which the appellee claims to have sustained other than the one dollar booking fee. Appellee does not show any expenses incurred because of his malicious prosecution. The record fails to show that the appellee Palmer has suffered any great damage to his reputation, but on the contrary discloses that Mr. B. W. Cameron, who had employed the appellee to work for him, had not heard any remarks reflecting on the general reputation for truth and veracity of the appellee, and Cameron testified that appellee's reputation is as good as it ever was. This is in conflict with the testimony of Buck Perkins, a truck patrolman for the Mississippi State Highway Department, who signed the bond for the appellee. Perkins testified that prior to his arrest in December his general reputation for truth and veracity in the community was good, but that since his arrest he has heard remarks about appellee's general reputation. These remarks consisted of calling him a jailbird. The record shows that Perkins is a distant cousin of appellee. Mr. Herschel Landrum, Constable of Beat 5 for eleven years, testified that the general reputation of appellee Palmer for truth and veracity in the community in which he lives is good; that the appellee had never been in any trouble with the law. On cross-examination Landrum, in substance, admitted that except for the fact he had heard some remarks around town, which remarks he did not disclose, the appellee's reputation, in his opinion, is as good as it ever was. Appellee's son Jimmy testified that at school he had heard some remarks about his daddy; that he heard a couple of remarks relative to the fact that his daddy had been put in jail. At the conclusion of all of the evidence in the case, the trial court sustained the motion for a directed verdict in

favor of the defendant, James L. McCaffrey, Sr., and granted a peremptory instruction to the jury to find in favor of the defendant James L. McCaffrey, Sr., and the final judgment contained the following language: "It is thereupon ordered and adjudged that the Plaintiff, Robert Palmer, do have and recover nothing whatsoever from the defendant, James L. McCaffrey, Sr., an individual. . . ." In spite of this language, and unknown to the appellants, the final judgment which was entered provided, "and it is the further judgment of the court that the plaintiff, Robert Palmer, do have and recover of and from the defendants, Delbert Gandy, James L. McCaffrey, Sr., d/b/a McCaffrey's Chain Saw Agency and McCaffrey's Real Estate and Insurance Agency Incorporated. . . ." A motion was duly made to vacate, set aside and annul that part of the judgment as to the defendant James L. McCaffrey, Sr., d/b/a Agency, and such motion was by the trial court sustained. A motion for a new trial was duly filed, which was overruled. Briefs were filed by each of the appellants, Delbert Gandy, and McCaffrey's Inc. Appellee Palmer answered each of these briefs and the appellants in turn filed reply briefs, and appellee Robert Palmer also filed a cross appeal objecting to the lower court's order sustaining the motion to vacate, set aside and annul the judgment which found James L. McCaffrey, Sr., d/b/a McCaffrey's Agency, responsible. A careful study of the testimony and evidence offered in this case, together with the authorities, convinces us that the trial court was correct in sustaining the motion for a directed verdict in favor of the defendant James L. McCaffrey, Sr., and in granting a peremptory instruction to the jury to find in his favor, and for the same reason we find that there is no merit in the contention of the cross-appellant, Robert Palmer, as set out in his reply brief, that the lower court erred in sustaining the motion and entering the order vacating, setting aside and annulling

the aforesaid judgment as to the defendant, James L. McCaffrey, Sr., d/b/a Agency.

Addressing ourselves to the errors set forth in the briefs of the appellants, we find that eleven errors are assigned by the appellants, Delbert Gandy, and McCaffrey's, Inc. The appellant, Delbert Gandy, assigns eight errors in his appeal from the verdict and judgment of the trial court. While considering all the errors assigned by both appellants, we will not comment thereon unless they are treated in the briefs of these appellants or appellees, or unless we feel that the errors merit discussion on our part. The assignments of error urged by both appellants clearly show that the basic legal questions presented by the evidence and set out in the briefs of counsel are: (1) Whether or not the appellant, McCaffrey's, Inc., was liable for the actions of the appellant, Delbert Gandy; and (2) whether or not appellant Gandy is liable for his actions in the alleged malicious prosecution and arrest of the appellee, Robert Palmer. At the outset, we hold that appellant Gandy is liable to the appellee for his acts in the criminal proceedings for the reasons hereinafter given. Insofar as the first question is concerned, the law in Mississippi governing the liability of the principal or employer for malicious prosecution which was instituted by an employee or agent, has been well established and long recognized. The rule is simply that an employer or principal is liable for malicious prosecution carried on by a servant or agent provided (1) that the act of the agent was expressly authorized, (2) that the act was within the scope of the agent's employment, or (3) that the acts of the agent were ratified by the master, and it is incumbent upon the plaintiff to so show. Russell v. Palentine Ins. Co., 106 Miss. 290, 63 So. 644 (1913); and Fisher v. Westmoreland, 101 Miss. 180, 57 So. 563 (1911).

In 34 American Jurisprudence *Malicious Prosecution* section 89 (1941), we find this language:

■■ ■■ ■ ''The principles of law governing the liability of an employer or principal for a malicious prosecution instituted or carried on by a servant or agent are simple, and any difficulty which may arise grows out of their application to the facts of a particular case. If the prosecution was previously authorized or subsequently ratified, or if within the scope of the servant's or agent's employment, the employer or principal is liable . . . .'' The proof in this case shows that the appellant, Delbert Gandy, was employed as outside collector by McCaffrey's, Inc. The record further shows that he attempted to collect the indebtedness due by the appellee and that he failed to do so; that the check given by the appellee in payment of his indebtedness had been issued by Lennep, who lacked sufficient funds so that the check could be cashed; that two efforts were made to cash this check on the part of the appellant, McCaffrey's, Inc., and that after the second failure to cash the check, the vice-president and general manager of McCaffrey's, Inc., Mrs. Ingram, instructed appellant Gandy to proceed to make an affidavit against the appellee, Robert Palmer, under the ''Bad Check Law.'' The record shows that appellant Gandy testified that he would have been fired if he had not done what ''she tell me'' to do, and further, appellant Gandy testified that he filed the affidavit because he wanted to collect the debt, out of which payment he was to receive ten per cent, and because his employer told him to do so. The facts in this case are sufficient for the lower court to have held that the agent or employee Delbert Gandy was expressly authorized by Mrs. Ingram to make the affidavit against appellee Palmer. It is unnecessary, therefore, for us to consider the question of whether or not this procedure was subsequently ratified by McCaffrey's, Inc., or whether the appellant, Delbert Gandy,

was acting within the scope of his employment. It is to be noted that the three conditions upon which an employer or principal can be held liable for the acts of a servant are stated in the disjunctive and not the conjunctive. Can it be held that it is obvious that the act which was authorized by the vice-president and general manager of McCaffrey's, Inc., was within the scope of her employment? Did Mrs. Ingram have the authority to so order appellant Gandy to do that which he did? Appellant urges under the rule and the facts as shown in the case of Hudson v. Pevsner, 216 Miss. 126, 61 So. 2d 777 (1953) that the appellant, McCaffrey's, Inc., is not liable for the malicious prosecution occasioned by its vice-president and general manager, Mrs. Ruth Ingram, and its collection agent, Delbert Gandy. Attorneys for appellant McCaffrey deem the citing of any other authority unnecessary.

As appellants urge, there is striking similarity between the case at bar and the Hudson v. Pevsner case. This similarity however does not prevent the cases from being easily distinguished. It is the great factual differences and not the similarities which prevent the same rule of law which denied liability in Hudson v. Pevsner from so operating in the case at bar.

In the Pevsner case the servant and employee, Mrs. Wigman, had been employed for a month only. Her limited duties were to open and close the diamond shop each day, to generally take care thereof, to be in charge of the sales of merchandise and the collections therefor. Her employer, Pevsner, knew nothing about the affidavit being made when the check was dishonored, and never ratified what Mrs. Wigman had done. In the case at bar Mrs. Ingram was more than an employee; she was the vice-president and general manager of McCaffrey's, Inc., and had been for some time. Mrs. Ingram had complete authority to operate the business as she saw fit. The president, James L. McCaffrey, Sr., testi-

fied in substance that she ran the office and he did not concern himself with the operation; that she had the authority to hire and fire. The record discloses that she had full and complete control over the collection of any and all accounts. It was Mrs. Ingram who hired appellant Gandy. She knew all there was to know about the affidavit being made because it was she who ordered the employee collector Gandy to execute the affidavit against the appellee. In carrying out the orders of his employer and superior, appellant Gandy was acting within the scope of his employment, and to have done otherwise could have caused him to be discharged. It is to be noted that Mrs. Ingram did not deny the statements to this effect made by employee Gandy. It cannot be questioned that Gandy's act in procuring the arrest of the appellee was expressly authorized by his master and was within the scope of his employment. There is no doubt but that Mrs. Ingram had the authority and perogative to order the affidavit to be made by the servant Gandy and that her act was the act of McCaffrey's, Inc., of which she was vice-president and general manager, not merely an employee, and it is therefore bound by her act of authority. Thus the Hudson v. Pevsner case is distinguished from the case at bar.

Likewise, this case is distinguishable from Brown v. Kisner, 192 Miss. 746, 6 So. 2d 611 (1942); State Life Ins. Co. of Indianapolis, Ind. v. Hardy, 189 Miss. 266, 195 So. 708 (1940); and Young v. L. B. Price Mercantile Co., 167 Miss. 409, 148 So. 643 (1933).

Appellant, McCaffrey's, Inc., urges that the case of Russell v. Palantine Ins. Co., 106 Miss. 290, 301, 63 So. 644, 646, 51 L.R.A. (N.S.) 471, 476 (1913) is controlling here. Under the facts in that case we said:

"Should we hold that appellee (master and employer) was responsible for the acts of Klein (servant and employee), it would be to hold, when an authority to collect a debt is shown, the law will imply the authority to

institute criminal proceedings against the debtor in case the debtor fails or refuses to pay. We do not believe that this is sound in reason or in law.''

In the instant case, we neither question this rule of law as announced in that case under the facts therein, nor do we restrict or extend its operation. It simply is not operative and controlling in the case at bar because here we do not imply the authority of the appellant, McCaffrey, Inc., to institute criminal proceedings. Its officer, Mrs. Ingram, its alter ego, had the authority to institute criminal proceedings, which authority was exercised. It was unnecessary, as the record discloses, for a meeting of the Board of Directors of appellant, McCaffrey's, Inc., to be held, and a resolution spread upon the minutes of said corporation, authorizing the criminal proceeding. The business world does not and could not efficiently so operate. In the instant case, the vice-president and general manager, in the absence of any proof to the contrary, had the authority, the legality, wisdom and exercise to do that which is questioned here.

The question which must next be considered is: Are the elements necessary to maintain the malicious prosecution action in Mississippi sufficiently established under the facts of this case? In Harvill v. Tabor, 240 Miss. 750, 128 So. 2d 863 (1961), wherein we cited 34 American Jurisprudence, *Malicious Prosecution* section 6 (1941), 54 Corpus Juris Secundum *Malicious Prosecution* section 4 (1948), it is stated:

''In order to maintain an action for malicious prosecution, the plaintiff must establish the following elements: (1) The institution or continuation of original judicial proceedings, either criminal or civil; (2) by, or at the instance of the defendants; (3) the termination of such proceeding in plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the suffering of damages as a result of the action or prosecution complained of.''

██ The appellee urges that each and every element of malicious prosecution action against the appellants can be found in the proof of this case. After carefully reading the record and studying the excellent briefs in this cause, we find (1) that the institution of the original criminal proceedings was by appellant Gandy, employed as an outside collector; (2) that this was at the specific order of his employer, McCaffrey's, Inc., given by its vice-president and general manager, Mrs. Ingram. (3) The record shows that the criminal proceedings terminated in appellee's favor since the appellants abandoned them. In 34 American Jurisprudence, *Malicious Prosecution* section 34 (1941) we find this language:

"It has frequently been held that there is a sufficient termination to meet the requirements in this respect in an action for malicious prosecution where the prosecution is abandoned either by the prosecuting attorney or the complaining witness. . . ." See cases cited thereunder. We held in Conn v. Helton, 232 Miss. 462, 99 So. 2d 646 (1958) that where the defendant did not appear anywhere to press charges against the plaintiff, who had been discharged in habeas corpus proceedings, for all intents and purposes the prosecution had been terminated. In that case, as in the case at bar, there was no preliminary hearing; only the affidavit was filed and the arrest made. There was nothing further done. The charges were not presented to the grand jury. In the instant case several grand juries have met. The appellee was not even bound over to the grand jury, and the district attorney stated he would not accept the charge against appellee. The proceedings have been terminated in appellee's favor. (4) the element of malice in the institution of the criminal proceeding is present. We held in Kitchens v. Barlow, 164 So. 2d 745 (Miss. 1964) that when the prosecution is for the purpose of using criminal processes of the law to collect a debt, such fact supplies the element of malice as a basis for

malicious prosecution. In State Life Insurance Company of Indianapolis, Indiana v. Hardy, 189 Miss. 266, 277, 195 So. 708, 713 (1940), we stated: ''The term 'malice,' in the law of malicious prosecution, is used in an artificial and legal sense, and simply means that the prosecution was instituted 'primarily because of a purpose other than that of bringing an offender to justice'; 3 Rest. Torts, Page 380, and Sec. 653; and instituting a prosecution for the purpose of aiding in the collection of a debt is for an improper purpose and therefore malicious. Odom v. Tally, 160 Miss. 797, 134 So. 163; Grenada Coca Cola Company v. Davis, 168 Miss. 826, 151 So. 743; and in O'Bryant v. Coleman, 169 Miss. 776, 152 So. 59, 154 So. 259. . . .''

■■■ It is undisputed in the instant case that the criminal proceedings were instituted (a) to collect a debt, and (b) because Gandy was ordered to do so. (5) There is a complete lack of probable cause for the proceedings in that the county attorney advised against it, and the justice of the peace at the outset would not take the affidavit and institute the proceedings without authorization from someone with authority. The appellants abandoned the proceedings and the district attorney stated that no criminal offense had been committed and he would not have entertained an indictment of the appellee, Palmer. (6) It is the element of suffering damages as a result of the prosecution which presents a vexing question. We pointed out in State Life Insurance Company v. Hardy, *supra,* that ''a plaintiff, in a malicious prosecution case, may recover 'damages for (a) the harm to his reputation which normally results from such an accusation as that brought against him, and (b) the distress which normally results from the initiation of such proceedings.' '' 189 Miss. at 280, 195 So. at 714.

■■■ The record discloses that appellee was arrested at his home when he was with his family. The

deputy sheriff required him to come to the county jail around eight or eight-thirty that night with bondsmen. The appellee had to go and advise his neighbors and friends of his arrest and ask them to help him make his bond in order that he would not be imprisoned in the jail. It cannot be doubted that his reputation was involved and harmed. It is common knowledge that applicants for jobs are frequently asked if they have ever been arrested and, if so, for what. The appellee, if asked this question, will have to admit and explain his arrest. That the appellee was embarrassed and inconvenienced cannot be questioned. He waited in the jail with his bondsmen, was booked therein and paid the one dollar booking fee. He executed his bond with the assistance of his bondsmen. Up to this time, the record discloses, he had never been arrested and there was nothing derogatory of his good name. He has had to bear the taunts of his acquaintances who referred to him as a jailbird. The anguish of his young son, over being told by his classmates that his father is a jailbird, he likewise has to endure. The damage to his good name, whatever it may be, is for determination only by a jury. The jury determined appellee's damages to be $10,000.00, and appellants now urge that there is no evidence to support a verdict of any substantial amount for actual damages, that the verdict is grossly excessive, and not supported by the evidence. To these questions we now address ourselves.

No special damages were set forth in the declaration, and the only actual monetary loss shown is the one dollar paid by appellee when booked in jail, and the loss in weekly earning of $75 to $125 to which appellee alone testified. Appellee failed to show any actual expenses he had incurred because of the criminal proceeding. Some of appellee's witnesses testified that in their opinion his reputation was the same, and as good as it was before the affidavit was made and he was ar-

rested. His present employer had heard nothing injurious to his reputation for truth and veracity.

We hold, therefore, that the proof offered by the appellee is insufficient to show the suffering and damages which the amount of the verdict indicates the appellee sustained. The proof is inadequate to show that appellee's good name and reputation have been damaged, or that he has been distressed to the extent the verdict and judgment represent. Our initial inclination was to simply reverse the judgment and remand the case for retrial as to damages only. However, since we find no errors in the actual trial of the case, and no reversible error committed in the granting or refusing of instructions, if, within fifteen days from the date this judgment becomes final, the appellee accepts a remittitur of $6,000, the judgment will be affirmed. If the appellee does not do so, this case is reversed and remanded, but as to damages only.

Reversed and remanded unless the appellee accepts the specified remittitur.

*Lee, C. J., and Ethridge, Gillespie and McElroy, JJ.,* concur.