**HYDE CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**KOEHRING COMPANY, Defendant.**

**Vardaman S. DUNN, Plaintiff,**

v.

**KOEHRING COMPANY, Defendant.**

**Nos. 4478, 4524.**

United States District Court, S. D. Mississippi, Jackson Division.

Dec. 31, 1974.

William E. Suddath, Jr., Vardaman S. Dunn, Jackson, Miss., for plaintiffs.

Dan H. Shell and Edward P. Lobrano, Jr., Jackson, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In these diversity actions, consolidated for trial, Hyde Construction Company, Inc. (Hyde) and Vardaman S. Dunn (Dunn), Mississippi citizens, sue Koehring Company (Koehring), a Wisconsin citizen, seeking substantial damages for malicious prosecution and abuse of process. Separate actions commenced by Hyde and Dunn [1] in the Circuit Court of the First Judicial District of Hinds County, Mississippi, were timely removed to this federal district court. Koehring's motions to dismiss for lack of personal jurisdiction or for transfer of venue were denied. Hyde Constr. Co. v. Koehring Co., D.C., 321. F.Supp. 1193 (1969). Koehring then filed responsive answers.

After extensive pretrial discovery and further orders of the district court, including an interlocutory appeal to the Fifth Circuit, Hyde Constr. Co. v. Koehring Co., 455 F.2d 337 (1972), which dealt with the scope of allowable discovery, the parties waived jury trial and submitted the issues to the court in an evidentiary hearing which began March 18, 1974.[2] At this trial the court received a joint stipulation of the parties, live testimony, depositions and voluminous exhibits. The court incorporates herein findings of fact and conclusions of law required by Rule 52, F.R. Civ.P.

The present suits arise as a sequel to extensive and unique litigation between Hyde, its attorney Dunn, and Koehring which began August 30, 1961, when Hyde sued Koehring in the United States District Court for the Southern District of Mississippi on a breach of warranty claim. After almost a decade of bitter contest, the litigation ended March 25, 1970, when Koehring discharged the judgment obtained by Hyde on its contract claims by paying $551,914.60. In the interim, various aspects of the controversy reportedly received the attention of no less than 30 judges in 9 state and federal courts.[3]

## I. BACKGROUND FACTS

In order to facilitate understanding of Hyde's and Dunn's present claims of misuse and abuse of process, we must develop the significant background facts at some length. In the latter part of 1959, Hyde, which was then engaged in the construction business, was awarded

---

1. Hyde's suit was filed May 22, 1969, and Dunn's followed September 11, 1969.

2. Until August 24, 1973, the proceedings herein were before United States District Judge Walter L. Nixon, Jr., who recused himself. By stipulation of the parties, Chief Judge William C. Keady of the Northern District of Mississippi assumed responsibility as the trial judge.

3. Pertinent phases of this litigation have been the subject of the following officially reported opinions:

Koehring Co. v. Hyde Constr. Co., 324 F.2d 295 (5 Cir. 1963);

Dunn v. Stewart, 235 F.Supp. 955 (D.C. Miss.1964);

Koehring Co. v. Hyde Constr. Co., 254 Miss. 214, 178 So.2d 838 (1965) and 253 Miss. 675, 178 So.2d 857 (1965);

Koehring Co. v. Hyde Constr. Co., 254 Miss. 214, 182 So.2d 580 (1966);

Hyde Constr. Co. v. Koehring; Dunn v. Koehring Co., 348 F.2d 643 (10 Cir. 1965);

Koehring Co. v. Hyde Constr. Co., 382 U.S. 362, 86 S.Ct. 522, 15 L.Ed.2d 416 (1966);

Stewart v. Dunn, 363 F.2d 591 (5 Cir. 1966);

Hyde Constr. Co. v. Koehring Co., 388 F.2d 501 (10 Cir. 1968);

Dunn v. United States, 388 F.2d 511 (10 Cir. 1968);

Koehring Co. v. Hyde Constr. Co., 424 F.2d 1200 (7 Cir. 1970);

Koehring Co. v. Hyde Constr. Co., 236 So.2d 377 (Miss. 1970).

a contract with the United States to construct a spillway for the Keystone Dam on the Arkansas River, in the State of Oklahoma. The performance of this contract required the acquisition and installation of a large concrete mixing and cooling plant. Hyde contracted to purchase from Koehring the concrete plant which Koehring proceeded to erect at the job site. Hyde became dissatisfied with the operation and capacity of the installed plant, and employed Dunn to bring an action against Koehring for breach of warranty. Suit was filed against Koehring on August 30, 1961, in the United States District Court for the Southern District of Mississippi, at Jackson, seeking damages for breach of warranty, an attachment against Koehring's resident debtors, and other relief. Koehring challenged the jurisdiction of the Mississippi federal court, claiming that Koehring was not subject to suit in Mississippi; in the alternative, Koehring moved for transfer of venue under 28 U.S.C. § 1404(a) to the federal district court for the Northern District of Oklahoma.[4]

Six days after the filing of this motion, Hyde, on September 27, 1961, sued Koehring in the Chancery Court of Hinds County, Mississippi, at Jackson, on the same breach of contract action and obtained jurisdiction under a state statute providing for chancery attachment, which was executed upon equipment dealers in Mississippi indebted to Koehring. Hyde filed the state action as a protective measure to be assured of a Mississippi forum in the event the Mississippi federal court failed to maintain jurisdiction. Koehring considered

but did not seek removal. Hyde did not immediately seek prosecution of the state action, allowing it to remain dormant pending disposition of Koehring's contentions before the federal court in Mississippi. After a hearing, United States District Judge Sidney Mize concluded that the federal court possessed in personam jurisdiction over Koehring, overruled Koehring's motion for dismissal or transfer of venue, but on June 15, 1962, certified his rulings for an interlocutory appeal to the United States Fifth Circuit Court of Appeals.

On September 19, 1963, the Fifth Circuit, without reaching the jurisdictional question, reversed Judge Mize on the venue issue and remanded the case to the district court for transfer to the Oklahoma court.[5] Ultimately, the mandate of the Fifth Circuit was carried out, and the federal suit was transferred to the U. S. District Court for the Northern District of Oklahoma, effective March 10, 1964.

Meanwhile, Koehring had answered on the merits in the state court action, thus subjecting itself to the in personam jurisdiction of the Mississippi chancery court. Miss.Code Ann. § 2729 (1942); Mobile and Ohio Ry. Co. v. Swain, 164 Miss. 825, 145 So. 627 (1933). The chancery court trial was then set to begin at 2 p. m. on March 11, 1964, after Chancellor Stennett, judge of the chancery court, had considered and overruled a series of motions by Koehring to stay or continue the trial.

On the forenoon of March 11, however, Koehring applied to Honorable Allen E. Barrow, United States District

---

4. When Hyde's federal suit was begun, Rule 4(e), F.R.Civ.P., had not yet been amended to permit the initiation of federal court actions through the use of state attachment procedures. See Advisory Committee Notes on 1963 Amendment to Rule 4(e), F.R.Civ. P. Prior to 1963, however, a federal court could gain jurisdiction by removal of a state action commenced by attachment procedures if ordinary conditions of removal were satisfied. Thus, the only viable ground of federal jurisdiction which Hyde could assert was that Koehring, although not qualified to do

business in Mississippi, was nevertheless subject to suit in the state because of its local business activity, and was amenable to process upon the Secretary of State of Mississippi under Mississippi's long-arm statute, Miss.Code Ann. § 1437 (1942).

5. Koehring Co. v. Hyde Constr. Co., 5 Cir., 324 F.2d 295. The transfer was ordered under 28 U.S.C. § 1404(a) if the Mississippi federal court had jurisdiction or under § 1406(a) if that court lacked jurisdiction.

Judge of the Northern District of Oklahoma, at Tulsa, for a restraining order to halt the trial of the chancery suit. At this hearing, Hyde challenged both the jurisdiction of the Oklahoma federal court and the power of the federal court, in view of the Anti-Injunction Act, 28 U.S.C. § 2283, to enjoin proceedings of the Mississippi state court.[6] Judge Barrow decided that, because of the nature of the case and the special circumstances incident to the transfer, § 2283 did not preclude the granting of a temporary restraining order to enjoin Hyde and its attorneys from prosecuting the Mississippi action, pending a determination of federal jurisdiction. Thus, at or about the same hour of the day when the trial on the merits was to begin in state court at Jackson, a temporary restraining order was granted by Judge Barrow, who also requested briefs on the issues and set the cause for hearing on Koehring's motion for preliminary injunction the following Monday, March 16. Hyde's attorneys received immediate notice of the order, and Chancellor Stennett was also notified by telegram from Judge Barrow.

Although Chancellor Stennett at first offered to recess the case to March 23, Dunn, without consulting Hyde's corporate officers, insisted that his client wished the trial to proceed despite the restraining order. The Chancellor, on March 12, ordered that the trial proceed, and this was done. That same day, Koehring filed in the Oklahoma federal court a petition charging Hyde and Dunn with willful disobedience of the restraining order, and obtained from Judge Barrow an order directing Hyde and Dunn to appear on March 14 at Tul-

sa to show cause why they should not be held in contempt of court.

The show-cause order was served upon Dunn on March 13 at Jackson, but no service was obtained upon Hyde or its corporate officers. Dunn failed to appear at the March 14 hearing, and Hyde was represented only briefly by counsel, who did not remain throughout the proceedings. Judge Barrow received evidence that Hyde and Dunn had violated his restraining order by proceeding with trial after notice of the restraint. The court found Hyde and Dunn in civil contempt. After announcing from the bench that criminal contempt proceedings were also involved, the court directed the United States Attorney to prepare an order for Dunn's arrest and appearance at Tulsa. An arrest order issued forthwith, and on March 16 was served on Dunn at Jackson. Dunn immediately sought habeas corpus relief from Judge Mize, who released him on bail and later ruled that the arrest order was void.[7]

Dunn was thus able to resume the prosecution of the chancery trial until the case concluded on March 25; and on April 8, Chancellor Stennett rendered an in personam decree for $464,450.08 in favor of Hyde against Koehring. Koehring appealed to the Mississippi Supreme Court from Chancellor Stennett's decision on the merits. On October 4, 1965, the state supreme court upheld the jurisdiction of the chancery court to hear the case, notwithstanding the pendency of the federal action, and affirmed the decree in favor of Hyde with a reduction of about $50,000 in damages.[8] Koehring considered but decided against petitioning the United

---

6. 28 U.S.C. § 2283:
"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

7. Dunn v. Stewart, 235 F.Supp. 955 (D.C. Miss.1964). It was Judge Mize's view that the underlying restraining order was invalid because of the federal anti-injunction statute

and also because the arrest order was one for civil contempt, controlled by the territorial limits of effective service, Rule 4(f), F. R.Civ.P., and not effective to subject Dunn, who was served outside the state of Oklahoma and more than 100 miles from Tulsa, to lawful arrest.

8. Koehring Co. v. Hyde Constr. Co., 254 Miss. 214, 178 So.2d 838 (1965); 253 Miss. 675, 178 So.2d 857 (1965).

States Supreme Court for writ of certiorari. The judgment obtained by Hyde thus became final.

During this time interval, however, civil contempt proceedings by Koehring against Dunn and Hyde went forward in the Oklahoma federal court. On June 18, 1964, Judge Barrow conducted a hearing on Koehring's petition for sanctions in civil contempt against Hyde and Dunn. On September 1, 1964, the district judge enjoined Hyde from collecting the judgment rendered against Koehring, directed that the case be retried at Tulsa, entered a civil contempt judgment in favor of Koehring against Hyde and Dunn for $9,009.80 to defray litigation expenses, but nevertheless allowed Hyde to participate in the appeal then pending in the Mississippi Supreme Court.

In a subsequent appeal, the United States Supreme Court determined, on January 17, 1966, that the transfer order of the Fifth Circuit vested jurisdiction in the Oklahoma district court.[9]

On March 21, 1966, Hyde filed a motion in the Oklahoma federal court to dissolve the September 1, 1964, injunction against collecting the Mississippi judgment, to vacate the civil contempt orders, and to dismiss the action. Hyde pleaded that the Mississippi judgment constituted res judicata to any further proceedings. When these motions were overruled April 18, 1966, Hyde took an appeal to the Tenth Circuit which grant-

ed a stay of further proceedings in the district court pending appeal.

Meanwhile, on June 28, 1966, the Fifth Circuit reversed and vacated Judge Mize's habeas corpus order which had discharged Dunn from custody.[10] Dunn advised Judge Barrow that he would appear at Tulsa upon request to answer contempt charges, without necessity of further process.

On July 22, 1966, the United States Attorney at Tulsa instituted formal criminal contempt charges against Dunn who was arraigned and pled not guilty. Dunn also moved for change of venue to Mississippi and for a jury trial. Both motions were overruled. After a hearing before the court on August 23, Dunn was adjudged guilty of criminal contempt and sentenced to three months in jail. Dunn was immediately released on his personal bond pending appeal of the conviction to the Tenth Circuit. On January 24, 1968, the Tenth Circuit decided that Judge Barrow's March 11, 1964, temporary restraining order against the prosecution of the state action was invalid because of the prohibition in § 2283. The Tenth Circuit vacated the district court's orders which enjoined Hyde's collection of its judgment and which awarded Koehring damages in civil contempt.[11] Koehring petitioned the Supreme Court for certiorari, which was denied May 6, 1968. This nullified all civil orders entered against Hyde and Dunn by the Oklahoma federal court.

9. Koehring Co. v. Hyde Constr. Co., 382 U.S. 362, 86 S.Ct. 522, 15 L.Ed.2d 416 (1966), rev'g. Hyde Constr. Co. v. Koehring Co., 348 F.2d 643 (10 Cir. 1965). In its decision, the Supreme Court did not address the issue of the power of the district court to enjoin the state court proceedings, since the Tenth Circuit did not reach that question on the first appeal.

10. Stewart v. Dunn, 363 F.2d 591 (5 Cir. 1966). The Fifth Circuit held that since the Oklahoma federal court had jurisdiction when it issued the restraining order, the validity of the order vis-a-vis 28 USC § 2283 could be challenged only on appeal, and not in a habeas corpus proceeding. Hence, it was a lawful order. The court was also of the view that the proceedings at Tulsa, con-

sisting of the petition to cite for contempt, affidavit, and show-cause order, which were served upon Dunn one day before the hearing, were adequate to meet the procedural requirements of Rule 42, F.R.Crim.P., for the court to entertain criminal contempt proceedings and issue the order for Dunn's arrest. "It should also be noted that we are not concerned with a case of conviction for criminal contempt, but only with the sufficiency of the procedures followed by the Oklahoma District Court to bring appellee before it on a criminal contempt charge." 363 F.2d at 600.

11. Hyde v. Koehring, 388 F.2d 501 (10 Cir. 1968), cert. denied 391 U.S. 905, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968).

In a separate opinion, the Tenth Circuit also reversed Dunn's conviction of criminal contempt and remanded the case to the district court for further proceedings.[12] The Court of Appeals declared that the invalidity of the temporary restraining order did not destroy the criminal contempt conviction since the district court had requisite jurisdiction. Reversal was ordered, nevertheless, because the conviction was based upon an assumption that the restraining order was valid, and the district court should have an opportunity to determine whether Dunn should be subjected to punishment for disobedience of an invalid order. Subsequently, on August 27, 1968, Judge Barrow dismissed the criminal charge against Dunn.

A charge of criminal contempt had also been instituted against Hyde on a show-cause order issued by Judge Barrow on April 7, 1966. This proceeding was initiated pursuant to an affidavit filed by Koehring. Hyde entered a plea of not guilty to this charge. The criminal proceeding remained in abeyance until the Tenth Circuit's reversal of the district court's orders of injunction and civil contempt. On May 17, 1968, Koehring filed a petition in the criminal contempt action, alleging that Hyde was without assets other than the unpaid judgment against Koehring, and paid into court the full amount of the Mississippi judgment, with accrued interest, to insure the availability of funds to pay any fine that the court might impose, in the event of Hyde's conviction of criminal contempt On that same day, Koehring obtained an order restraining Hyde from attempting to collect its judgment pending disposition of the Hyde criminal contempt charge. In hearings before Judge Barrow on May 21, Koehring contended that Hyde might be fined for criminal contempt in an amount equal to the Mississippi judgment, in which event all or a portion of such fine could be paid to Koehring to diminish its obligation under that judgment. The United States Attorney questioned the standing of Koehring and the propriety of awarding Koehring any portion of a fine for criminal contempt, should one be levied against Hyde. The court declined to issue the requested injunction, directed that the money paid into court be returned to Koehring, and dismissed Koehring's petition. Although the criminal contempt charge against Hyde remained pending on the docket, it never came to trial, and was finally dismissed on March 4, 1969.

When Hyde proceeded to issue execution in Mississippi on the judgment, Koehring, on May 27, 1968, filed in the United States District Court for the Eastern District of Wisconsin at Milwaukee, a petition in the nature of an interpleader, asserting that it was confronted with conflicting claims as judgment debtor to Hyde. Koehring then paid into that court the amount of the Mississippi judgment plus accrued interest, and obtained an ex parte order from the Wisconsin federal court enjoining Hyde from attempting to collect its judgment. In this action, which stayed execution and garnishment proceedings in Mississippi, Koehring asserted, as a possible offset, its own potential claim to the interpleaded funds, by referring to an alleged allocation of a fine upon conviction of Hyde, should that occur in the still pending Oklahoma criminal contempt proceeding. Hyde moved to dismiss the interpleader action, or, alternatively, to transfer it to the Mississippi federal court. On January 20, 1969, the Wisconsin federal court dismissed the interpleader action. Koehring appealed to the Seventh Circuit and obtained an order reinstating the injunction against enforcement of the Mississippi judgment pending appeal.

During the pendency of the Wisconsin interpleader action, Hyde, alleging insolvency, applied to the Mississippi chancery court for a voluntary receivership to take charge of its assets, principally the judgment obtained from Koehring,

12. Dunn v. United States, 388 F.2d 511 (10 Cir. 1968).

and to determine the priority of its creditors. These proceedings were allowed by the Seventh Circuit in an interim order. Koehring attempted to vacate the Mississippi receivership on the ground that it was established without notice to all interested parties. On June 6, 1969, the chancery court denied Koehring's petition to set aside the receivership, and later entered a decree adjudicating priority of claims as between creditors Dunn, United States Fidelity & Guaranty Company, and First National Bank of Jackson to the judgment proceeds expected to be recovered by Hyde from Koehring. Koehring appealed to the Supreme Court of Mississippi from these orders. On March 17, 1970, the Seventh Circuit affirmed the dismissal of the Wisconsin interpleader action and vacated the last injunction secured by Koehring.[13] After the Seventh Circuit dismissed the Wisconsin interpleader action and vacated the federal injunction, Koehring dismissed its appeals in the state supreme court and at last paid·the judgment to the chancery receiver.

## II. CONTENTIONS OF PARTIES; APPLICABLE LAW

Hyde contends that the myriad civil processes instituted against Hyde by Koehring were all part of a persistent design by Koehring to frustrate or nullify the lawful judgment rendered by the courts of Mississippi; and also that criminal processes were invoked for Koehring's private gain or advantage. It is argued that these procedures render Koehring liable for the torts of abuse of process and malicious prosecution. Hyde seeks to recover as compensatory damages large sums it expended to resist Koehring's ·maneuvers, as well

as punitive damages.[14] Similarly, Dunn in his separate action contends that Koehring's participation in his contempt proceedings, and the related habeas corpus action, was a perversion of legal process for Koehring's private gain. Dunn claims actual damages for legal expenses, loss of liberty, mental anguish, and injury to his professional reputation, together with exemplary damages.

Koehring seeks to refute Hyde's claims, asserting that the several civil procedures which it invoked were a lawful exercise of its rights, and denying that it impermissibly initiated criminal contempt proceedings against Hyde for its civil gain. With respect to Dunn, Koehring contends that Dunn's arrest and subsequent prosecution and conviction for criminal contempt were directed by the federal court whose restraining order Dunn had disobeyed; and, that though the conviction was later reversed, the contempt proceeding against Dunn was based upon probable cause, and not initiated or pursued by Koehring for unlawful purposes. In defense of both actions, Koehring further asserts that if its attorneys and agents did in fact act impermissibly or unlawfully at any stage of the several judicial proceedings, Koehring, as the corporate principal, would not be liable for such acts. Koehring also pled that both actions were barred by limitations, first invoking a two-year statute of limitations provided by Oklahoma law. (§ 95, Title 12, Okla. Statutes, Annotated).

■ Our threshold inquiry is to determine what law governs the substantive rights of the parties as well as the plea of limitations. In making these determinations, we are, of course, Erie-bound to apply Mississippi conflict of law rules.

---

13. Koehring Co. v. Hyde Constr. Co., 424 F. 2d 1200 (7 Cir. 1970).

14. By order of the Supreme Court of Mississippi, Hyde paid Dunn and his law firm 50% of the judgment proceeds finally collected from Koehring, or $275,957.30. Koehring Co. v. Hyde Constr. Co., 236 So.2d 377 (Miss. 1970). It is stipulated that $50,518.63 represents the fair value of legal services allocated to litigate the merits of the contract action. Hyde thus claims out-of-pocket losses of $225,438.67 expended for attorney fees. Hyde also claims damages of $16,567.12 incurred for other expenses in resisting the series of collateral proceedings initiated by Koehring. See Stip. of Parties, 39.

At all pertinent times both Hyde and Dunn were residents of Mississippi; the processes complained of, though issued by federal courts outside the state, were locally served and designed to affect Hyde's and Dunn's activities in Mississippi court proceedings; and the losses and injuries said to have resulted from Koehring's actions were sustained in that jurisdiction. The law of the forum state presumptively applies, unless it is shown that some other jurisdiction had contacts of greater significance. Mitchell v. Craft, 211 So.2d 509 (Miss.1968). It does not appear that Oklahoma or Wisconsin was the situs of events sufficient to overcome this presumption. Moreover, when measured by the "center of gravity" rule enunciated in Mitchell v. Craft, supra, the substantial contacts of the litigants with the forum state make it proper to decide the cases in accordance with Mississippi law. Finally, even if the Fifth Circuit has not expressly mandated this result upon the interlocutory appeal,[15] the parties now take the position before us that Mississippi law should govern.

We next hold that Hyde's and Dunn's cases, whether considered as actions for abuse of process, malicious prosecution, or both, are not barred by limitations. Mississippi follows the traditional rule that statutes of limitation are "procedural" rather than "substan-tive" and that the forum's limitations apply. Sheets v. Burman, 322 F.2d 277 (5 Cir. 1963); Kershaw v. Sterling Drug, Inc., 415 F.2d 1009 (5 Cir. 1969). The statute of limitation applicable to these actions is Miss.Code Ann. § 15–1–49 (1972), which allows bringing of suits within six years after the cause of action accrues.[16] Hyde's action was commenced less than one year after the dismissal of the Oklahoma criminal contempt proceedings, and even before the termination of Koehring's last invocation of civil process in the Wisconsin interpleader action. Although Dunn's action was primarily based upon his 1964 arrest and conviction for criminal contempt in 1966, the prosecution against him was not finally dismissed until August 27, 1968. Thus, both causes of action sued upon accrued within six years prior to the commencement of suit.[17]

We next consider the state's substantive law applicable to the instant actions. Abuse of process and malicious prosecution are separate torts traditionally recognized in Mississippi as grounds for recovery against one who has utilized the judicial process impermissibly. Although conceptually distinct, the two causes of action share much in common and often overlap.

Abuse of process, or malicious abuse of process as it is often termed, is the intentional use of legal process for

15. "Given the facts which obtain, we are of the opinion that a Mississippi court would find that Mississippi had the most substantial contacts with the occurrences on which the alleged tort rests, and would apply Mississippi law to the present suits." 455 F.2d at 341.

16. § 15–1–49 provides:
"All actions for which no other period of limitation is prescribed shall be commenced within six years next after the cause of such action accrued, and not after."

17. On the eve of trial, Koehring sought to amend its answers to plead Mississippi's one-year statute of limitations, Miss.Code Ann. § 15–1–35 (1972), which provides:
"All actions for assault, assault and battery, maiming, false imprisonment, malicious arrest, or menace, and all actions for slanderous words concerning the person or title, and for libels, shall be commenced within one year next after the cause of such action accrued, and not after."
The court declined to allow the amendment because of cogent equitable considerations, including estoppel. Should our refusal to allow the amendment be error, it is unclear whether § 15–1–35 is applicable to the causes of action here pursued. Compare Childers v. Beaver Dam Plantation, 360 F.Supp. 331 (N.D.Miss.1973), and Dennis v. Travelers Ins. Co., 234 So.2d 624 (Miss.1970), with Bush v. Laurel, 234 Miss. 93, 105 So.2d 562, 566 (1958). Even if § 15–1–35 were allowed to apply, Hyde's claim would not be barred. The one-year limitation period would be effective as to Dunn's suit. In view of our disposition of Dunn's claims, however, the plea of limitations becomes immaterial.

an improper purpose incompatible with the lawful function of the process by one with an ulterior motive in doing so, and with resulting damages.[18] In proving abuse of process, it is not necessary to show the tortfeasor's motive for securing issuance of the process. It is required only that the process, once obtained, is willfully misapplied. The unlawful use creates a rebuttable presumption of an ulterior motive, which it is incumbent on the defendant to overcome by proof of good faith or mistake. Wilkerson v. Randall, supra, 180 So.2d at 306–307. The improper use which is the essence of the tort is ordinarily an attempt to secure from another some collateral advantage not properly includable in the process itself, and is, in Prosser's words, "a form of extortion" in which a lawfully used process is perverted to an unlawful use. W. Prosser, The Law of Torts, § 121 at 857 (4 ed. 1971).

 Malicious prosecution, on the other hand, consists of the initiation of unsuccessful civil or criminal judicial proceedings with malice and without probable cause, and with resulting damage.[19] The malice requirement in an action for malicious prosecution may be satisfied by the actual presence of a sinister or improper purpose, such as the institution of criminal proceedings for the primary purpose of collecting a debt, or for any purpose other than bringing an offender to justice. Fowler v. King, 254 Miss. 61, 179 So.2d 800 (1965); Oberlin v. Dixon, 251 Miss. 872, 171 So.2d 512 (Miss.1965); Gandy v. Palmer, supra, 169 So.2d at 826–827; Kitchens v. Barlow, 250 Miss. 121, 164 So.2d 745 (1964); Harvill v. Tabor, supra, 128 So.2d at 864–865; Rhodes v. Roberts, supra, 78 So.2d at 617, Brown v. Watkins, 213 Miss. 365, 56 So.2d 888 (1952); Brown v. Kisner, supra, 6 So.2d at 617. Malice may also be inferred by the palpable absence of probable cause to bring the prosecution or by other circumstances. Harvill v. Tabor, supra, 128 So.2d at 864–865; Winters v. Griffis, supra, 101 So.2d at 348; Brown v. Watkins, supra, 56 So.2d at 891; Odom v. Tally, 160 Miss. 797, 134 So. 163 (1931). It is elementary that the defendant must also be shown to have proximately caused the malicious prosecution. Cooperation in or sympathy toward a prosecution is not enough to sustain the action. Winters v. Griffis, supra. In Mississippi, it is also clear that a judgment of conviction at the original prosecution, whether reversed or not, is prima facie if not conclusive evidence of probable cause, at least in the absence of fraud, perjury or other corrupt practices. Brooks v. Super Services, 183 Miss. 833, 185 So. 202 (1938). Accord, Restatement, Law of Torts § 667(1). See annotation 86 ALR 2d 1094, 1111. Thus, a claim for malicious prosecution is defeated where the prosecution does not terminate in favor of the accused.

18. Wilkerson v. Randall, 254 Miss. 546, 180 So.2d 303 (1965); Edmonds v. Delta Democrat Publishing Co., 230 Miss. 583, 93 So.2d 171, 174 (1957); State v. U. S. F. & G. Co., 217 Miss. 576, 64 So.2d 697 (1953). In State ex rel Richardson v. Edgeworth, 214 So.2d 579, 586 (Miss.1968), the three elements of abuse of process were defined as [1] "The defendants made an illegal, improper, perverted use of the process, [2] they had an ulterior motive or purpose in doing so, and [3] damages resulted to plaintiffs from the irregularities."

19. Gandy v. Palmer, 251 Miss. 398, 169 So.2d 819, 826 (1964); Winters v. Griffis, 233 Miss. 102, 101 So.2d 346 (1958); Edmonds v. Delta Democrat Publishing Co., supra, 93 So.2d at 174; Rhodes v. Roberts, 223 Miss.

580, 78 So.2d 614 (1955); State v. U. S. F. & G. Co., supra, 64 So.2d at 704; Brown v. Kisner, 192 Miss. 746, 6 So.2d 611 (1942); State Life Ins. Co. v. Hardy, 189 Miss. 266, 195 So. 708 (1940).

In Harvill v. Tabor, 240 Miss. 750, 128 So.2d 863, 864 (Miss.1961), the Supreme Court of Mississippi delineated the six elements of malicious prosecution: "(1) The institution or continuation of original judicial proceedings, either criminal or civil . . .; (2) by, or at the instance of the defendants; (3) the termination of such proceeding in plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceedings; and (6) the suffering of damages as a result of the action or prosecution complained of."

Mississippi jurisprudence recognizes that malicious prosecution and abuse of process are distinguishable in several respects. Edmonds v. Delta Democrat Publishing Co., supra, 93 So. 2d at 174; State v. U. S. F. & G. Co., supra, 64 So.2d at 704. First, it is necessary to an action for malicious prosecution that the original prosecution has terminated. An abuse of process action may be brought during the pendency of the complained of action. Secondly, abuse of process is essentially based on the use, and not the issuance, of the process, while a prosecution may be malicious, and actionable, upon commencement of the judicial proceeding. Thirdly, questions of probable cause, while essential to a malicious prosecution action, are irrelevant to abuse of process claims. The mens rea required of the two actions in Mississippi is, although technically distinguishable, practically identical. In each, the defendant has acted with an intent antithetical to the proper reasons for invocation of the judicial process. In either action, intent may be inferred—by the lack of probable cause in malicious prosecution, and by the fact of misuse of process in abuse of process. The two actions also overlap. The use of the criminal process to collect a civil debt, for example, can constitute both abuse of process and malicious prosecution.

Finally, Mississippi law permits a principal to be held liable for malicious prosecution or abuse of process for acts of his agents which were expressly authorized, ordered or ratified by the principal, or which were committed as acts within the scope of the agent's authority. Allen v. Ritter, 235 So.2d 253 (Miss.1970); Wutzke v. Wayne Lee's Grocery and Market, 199 So.2d 438 (Miss.1967); Fowler v. King, supra, 179 So.2d at 803; Gandy v. Palmer, supra, 169 So.2d at 824–826; Brown v. Kisner, supra, 6 So.2d at 613; Fisher v. Westmoreland, 101 Miss. 180, 57 So. 563 (1911).

Apart from state law, the court must address the significance of civil and criminal contempt proceedings in a federal court, which figure prominently in Hyde's and Dunn's claims. Relevant principles of law in this area are summarized in the instructive discussion in Walling v. Crane, 158 F.2d 80, 83 (5 Cir. 1946):

"Broadly speaking, a civil contempt is a failure of a litigant to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein, but the courts also hold that a contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended chiefly as a deterrent to offenses against the public. A criminal contempt is an act against the dignity or authority of the court, the majesty of the law, and, to use the language of Justice Cardozo, is for the 'vindication of the public justice.'

Civil contempt is coercive and looks to the future. Criminal contempt punishes a past act, and a contempt which punishes for a past affirmative act is punitive and criminal, although it is not the punishment that is inflicted, but its purposes, that often determines whether a proceeding in contempt is civil or criminal. Imprisonment may be had for a civil contempt where the defendant has refused to do an affirmative act required by the provisions of a mandatory order, but if the imprisonment is for an act already accomplished, it would be punitive in its nature and a criminal contempt."

Courts recognize that the concepts of civil and criminal contempt, though discrete, are not mutually exclusive, and that one pattern of contumacious conduct can, and often does, constitute civil and criminal contempt. In that event, both civil and criminal sanctions are proper, and the civil and criminal aspects may be determined in the same proceeding. United States v. United Mine Workers, 330 U.S. 258, 298–299, 67 S.Ct. 677, 91 L.Ed. 884 (1947);

Cliett v. Hammonds, 305 F.2d 565, 569 (5 Cir. 1962); Lopiparo v. United States, 222 F.2d 897, 898 (8 Cir. 1955); Backo v. Local 281, 308 F.Supp. 172 (N.D.N.Y.1969).

In imposing remedial civil contempt sanctions, the court may consider the character and magnitude of the harm threatened by continued defiance and the probable effectiveness of any sanction in achieving compliance. Punitive sanctions in criminal contempt may be predicated on the extent of the intentional defiance, the gravity of the consequences, the public interest at stake in ending the defiance, and the importance of deterring such acts in the future. United States v. United Mine Workers, supra, 330 U.S. at 303–304, 67 S.Ct. 677.

In civil contempt, willfulness is not an essential element of the offense. In the words of Justice Douglas, "[s]ince the purpose is remedial, it matters not with what intent the defendant did the prohibited act." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). See also United States v. Greyhound Corp., 363 F.Supp. 525 (N.D.Ill. 1973). Conversely, in criminal contempt, the defendant must have acted willfully, in intentional defiance of the court's dignity and authority. In re Brown, 147 U.S.App.D.C. 156, 454 F.2d 999, 1006–1007 (1971); United States v. Greyhound Corp., supra, 363 F.Supp. at 534.

In criminal contempt, the invalidity of the defied court order is ordinarily no defense to the charge. "In contrast, civil contempt falls with the order if it turns out to have been erroneously or wrongfully issued." Cliett v. Hammond, supra, 305 F.2d at 570; United States v. Seale, supra, 461 F.2d at 361; Hyde Constr. Co. v. Koehring Co., 388 F.2d 501, 511 (10 Cir. 1968); Backo v. Local 281, 308 F.Supp. supra, at 176; United States v. United Mine Workers, supra.[20]

Finally, although the contemptuous party may be imprisoned in both proceedings, imprisonment in civil contempt is coercive, for an indefinite period, and may be ended at any time by the party's compliance. In criminal contempt, imprisonment is punitive, not coercive, and hence for a fixed term. Gompers v. Buck's Stove and Range Co., supra, 221 U.S. at 441–442, 31 S.Ct. 492; Lance v. Plummer, 353 F.2d 585, 592 (5 Cir. 1965); Yates v. United States, 227 F.2d 844, 846 (9 Cir. 1955); Walling v. Crane, supra; United States v. Greyhound Corp., supra, 363 F.Supp. at 534.

Monetary fines in civil contempt are payable to the party injured by noncompliance with the court's order and are related to, and ordinarily should not exceed, the injured party's proved losses and litigation expenses, including counsel fees. Fines in criminal contempt are wholly punitive and unrelated in amount to any private damages caused by the contemptuous conduct.[21] Fines in purely criminal contempt, moreover, are not allocable to private litigants, since it is the authority and dignity of the court which is endangered,

20. Important procedural differences also obtain with respect to criminal contempt proceedings, which must satisfy the due process and other constitutional safeguards impressed on all criminal proceedings, including notice of the criminal contempt in compliance with Rule 42(b), F.R.Crim.P., and proof of guilt beyond a reasonable doubt. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911); Clark v. Boynton, 362 F.2d 992, 996 (5 Cir. 1966); Cliett v. Hammonds, supra, 305 F.2d at 569–570; United States v. United Mine Workers, supra, 330 U.S. at 297, 67 S.Ct. 677; Backo v. Local 281, supra, 308 F.Supp. at 178. A jury trial is required in "serious" criminal contempt proceedings, i. e., those in which the defendant is sentenced to a term of imprisonment of more than 6 months. Bloom v. Illinois, 391 U.S. 194, 198, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); United States v. Seale, 461 F.2d 345, 352 (7 Cir. 1972); Clark v. Boynton, supra, 362 F.2d at 999.

21. United States v. Greyhound Corp., 370 F. Supp. 881 (N.D.Ill.1974).

not private interests.[22] We are aware that in some cases involving criminal contempt proceedings fines have been paid over to the opposing party, or divided between the court and the private litigants.[23] It is plain, however, that in each such instance the criminal contempt conviction was accompanied by a valid civil contempt decree so that allocation of fines to private litigants was based solely on the civil aspect of the dual proceeding. We find no instance in which any court, *in exclusively criminal contempt proceedings,* has allowed private litigants to share in a fine which is punitive and devoid of remedial purpose. This result inevitably flows from the absence of any proprietary claim of a private party in the vindication of judicial authority. We thus declare that it is an impermissible use of the contempt process for a private party, uninjured by the contemnor's actions, to seek conviction in criminal contempt for the manifest purpose of private gain or advantage, *when the contempt, indisputably, has been only of the court.*[24]

Guided by the foregoing legal principles, we have carefully examined the lengthy trial record, giving special emphasis to transcripts of several proceedings before the Oklahoma federal court, the testimony and correspondence files of Koehring's general counsel Steven Keane and Maurice J. McSweeney, Koehring's staff attorney William Denny, of Milwaukee, its local counsel Villard Martin, Jr., at Tulsa, and A. Morgan Brian, Jr., at New Orleans, as well as the depositions of staff members of the U. S. Attorney's office at Tulsa. This mass of material suggests a scenario in which McSweeney emerges as the "idea" man, Denny the project director, and Martin, and, to lesser degree, Brian, the supporting cast in a production of almost epic proportions.

Dunn insinuates that such a togetherness exists between his and Hyde's claims that the court must accord the same treatment to each case. We disagree. In our view, Dunn's action, whether viewed as based upon malicious prosecution or abuse of process, is wholly without merit, while Hyde has convincingly established a right of recovery for Koehring's commission of both torts. We shall discuss the bases of our adverse holding as to Dunn before reaching the merits of Hyde's action.

### III. THE FAILURE OF DUNN'S CASE

The record unmistakably shows that Dunn, as Hyde's attorney, not only initially determined the nature of Hyde's litigation against Koehring but was the major, if not sole, influence in shaping Hyde's participation in the ensuing bitter struggles. It is equally clear that though Dunn finally emerged triumphant from the fray, his victory was not without great cost to Hyde and an affront to judicial authority. When

22. In re Christensen Engineering Co., 194 U.S. 458, 24 S.Ct. 729, 48 L.Ed. 1072 (1904); Hyde Constr. Co. v. Koehring Co., 348 F.2d 643, 648 (10 Cir. 1965); Merchants' Stock & Grain Co. v. Board of Trade of City of Chicago, 201 F. 20 (8 Cir. 1912). But see Michaelson v. U. S. ex rel, Chicago, St. Paul Minneapolis & Omaha Ry. Co., 266 U.S. 42, 65, 45 S.Ct. 18, 69 L.Ed. 162 (1924) (dicta).

23. Cary Mfg. Co. v. Acme Flexible Clasp Co., 108 F. 873 (2 Cir. 1901); See Merchants' Stock & Grain Co. v. Board of Trade of City of Chicago, 223 U.S. 639, 32 S.Ct. 339, 56 L.Ed. 584 (1912); In re Christensen Engineering Co., supra; Worden v. Searls, 121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853, 857 (1887).

24. More than 60 years ago, the Eighth Circuit, in Merchants Stock & Grain Co. v. Board of Trade of Chicago, plainly stated the governing rule:
 "So far as the apportioning of the fine is concerned between the plaintiff and the government, it is, of course, customary in strictly criminal contempts to assign the entire fine to the government, and in strictly civil contempts it is equally the custom to assign the entire fine to the complainant. . . . But, where the contempt has been *both of the court and of the rights of the adverse party,* it has been frequently the custom to divide the fine between the government and the injured party." (Emphasis added). 201 F. at 29–30.

viewed in simple terms, Dunn's case concerns a concededly invalid order issued by a court in a case over which it had undoubted jurisdiction.[25] What converted the commonplace into the unprecedented was that both Koehring and Dunn took inflexible yet mistaken positions with respect to the temporary restraining order. Koehring's serious error, as it turned out, was in acting upon the restraining order and continuing to invoke it even after its invalidity had become both apparent and judicially determined. Dunn's mistake was one of equal dimension: he chose to act as if the federal court had no jurisdiction over him or his client when it issued what he, correctly, believed to be an unauthorized injunction. Had Dunn sought correction of the improvidently issued restraining order in a conventional manner, before the trial court or on appeal, the consequences of which Dunn now complains would not have occurred. We are constrained to hold that Dunn's own actions, and not Koehring's reactions, were the primary causative agency of whatever injury Dunn sustained.

 Dunn's chief complaint is that he was arrested, prosecuted, convicted and sentenced for criminal contempt—a destiny odious to any attorney. Yet candor requires us to observe that it was Dunn's defiance which brought this about. The only conclusion supportable by the record is that Dunn, upon learning of the restraining order, freely chose to ignore it; in so doing, he proceeded at his peril.

As the Tenth Circuit, in Dunn v. United States, 388 F.2d 511, 513, aptly declared:

> "Dunn says that he had no free choice because the Mississippi court had ordered him to proceed with the trial before it. The record does not sustain the contention. Dunn further argues that his duty to his client required him to proceed with the Mississippi trial. Devotion to a client is no excuse for the violation of a court order.
>
> \* \* \* \* \* \*·
>
> "When a court has jurisdiction of the subject matter and person, its orders must be obeyed until reversed for error by orderly review. The district court had the requisite jurisdiction. Although it may be that Dunn did not have an opportunity to appeal the restraining order which had a life of only ten days, he should have obeyed it for that short period. The Supreme Court has said that: 'Violations of an order are punishable as criminal contempt even though the order is set aside on appeal, . . .'"

Dunn contends, however, that Koehring is nonetheless liable because it, for private gain, initiated criminal rather than civil contempt proceedings against him. Dunn refers us to language in Koehring's contempt petition which charges him with "willful disobedience" and seeks to have him "punished" along with Hyde for noncompliance.

 Although probative, the use of words commonly associated with one

25. The court transcript indicates that at the initial hearing of March 11, 1964, Judge Barrow was led into the error of restraining the chancery court proceedings by three possible considerations: (a) The Fifth Circuit itself had previously restrained the same chancery action and dissolved its order, not as erroneous, but as "no longer necessary or appropriate in aid of its jurisdiction"; Judge Barrow may have felt that the transferee court had co-extensive power; (b) Hyde's transferred action, involving an attachment of Koehring's debtors in Mississippi, had attributes of an in rem or quasi-in-rem action, presenting the possibility that the case might fall within a recognized exception to § 2283; and (c) When confronted with an emergency situation, a court has power to "preserve the status quo", at least briefly, until its jurisdiction is determined. Indeed, as to this last point, the Fifth Circuit later observed: "The law is clear that pending a decision on the question of jurisdiction, a District Court has the power to issue a temporary restraining order in order to preserve existing conditions." Stewart v. Dunn, 363 F.2d at 598.

category of contempt is not dispositive in classifying contempt proceedings as civil or criminal. In a doubtful case such as this one, the character of the proceeding itself, its purposes and the circumstances surrounding it, may determine whether it is civil or criminal. 4 Barron's Federal Practice & Procedure § 2428 at 383. For several reasons, we are unpersuaded that Koehring's contempt charge against Dunn was intended to invoke criminal process.

First, assuming the validity of the temporary restraining order at the time of issuance, Koehring had a legitimate interest in obtaining civil contempt sanctions against both Hyde and Dunn. The quoted language of its petition is not inconsistent with that objective.[26] In March 1964, Koehring's aim was to halt the Mississippi chancery trial, having in hand a show-cause order with which to coerce Hyde and its attorney into compliance, with jail sentence, if necessary. We credit testimony offered on Dunn's behalf that Denny stated, on the eve of the show-cause hearing, that he would like to see Dunn jailed for his defiance; but even if this remark were

chargeable to Koehring to impute motive for filing the contempt petition, imprisonment to coerce compliance is nonetheless characteristic of civil contempt,[27] and does not necessarily denote a charge of criminal contempt. It is clear that Koehring did no wrong by seeking to invoke civil sanctions against Dunn and his client and by requesting the district judge to issue the show-cause order. Contrary to Dunn's assertion, it was distinctly Judge Barrow, not Koehring, who raised the issue of criminal contempt at the March 14 hearing, a session which was conspicuously unattended by Dunn, in person or by counsel. The evidence reflects that the district judge, understandably indignant with what appeared to be open defiance,[28] was not content merely to adjudge Dunn and Hyde in civil contempt. Instead, the court, upon the call of the case, summarily stated that "this is a criminal contempt proceeding"; and when Hyde's counsel interposed a challenge, the judge quickly emphasized, "but I am saying it is a criminal contempt." Moreover, the record is replete with evidence of Koehring's clear intent to invoke civil sanctions at that time.[29] Unquestionably, it

26. Koehring's petition was filed as a civil pleading in Hyde's civil action transferred from Mississippi, and not under a criminal caption. Neither did the petition recite that it was for criminal contempt, as required by Rule 42(b), F.R.Crim.P., although it sought to "punish" the contemnor for disregard of the restraining order. In 4 West's Federal Forms § 5653, at 715, it is indicated the petition in civil contempt prays that defendant "show cause . . . why he should not be *punished* for violating [the order]." (Emphasis added) Compare 5 West Federal Forms § 7746 at 269–70 for petitions for prosecution of criminal contempt.

27. In a telephone conference call on March 13, 1964, between Chief Judge Murrah of the Tenth Circuit and counsel for Hyde and Koehring, when Hyde was endeavoring to intercept the district court's show-cause order, concern was expressed by Hyde's counsel about the possibility of Judge Barrow's ordering imprisonment at the next day's hearing. In this conversation, although Martin assured Chief Judge Murrah that it was not

Koehring's wish to put Dunn in jail, Denny intervened to say: "Yes, we do."

28. Martin, testifying by deposition, at 58–59 stated: "[Judge Barrow] felt very strongly . . . about the fact that his order was ignored, and he was most anxious . . . to deprive Hyde of the benefits of that disregarding of his order. For example when Bill [Denny] and I went into his chambers on the 12th of March with an application for show cause order, he sat bolt upright when we told him that the trial was continuing. . . ."

29. In the hearing transcript, Brian stated: "I feel this court can even impose some sanction for civil contempt this morning as a result of this hearing and since they [Hyde and Dunn] haven't appeared and shown cause why they should not be held in contempt, I think the court can even cite them in contempt and impose civil sanctions at this stage. If the court feels there is evidence of willfulness giving rise to a criminal proceeding, you can set the matter for hearing. . . . The important thing of the

was Judge Barrow's idea that the circumstances called for more, for the judge stated into the record: "I am going to ask the District Attorney to issue an order of arrest for Mr. Vardaman Dunn—body arrest, and when he is brought to this jurisdiction, the court will then set down a hearing on the criminal contempt of this court. . . . I further wish that the District Attorney will prepare the orders charging the contempt, setting forth all the necessary facts constituting the charges. . . ." Transcript of hearing, p. 288. Accordingly, the United States Attorney, upon this express direction, prepared and presented to the court an arrest order for Dunn.[30] Save in one stated particular, the evidence is devoid of any hint that Koehring or its attorneys agitated or otherwise suggested to Judge Barrow the institution of criminal process against Dunn.[31]

■ There is a second cogent reason why Dunn may not complain. Even if Koehring's actions were viewed as having contributed to Dunn's arrest, Koehring had not only a legitimate civil interest in halting the chancery action but also probable cause to believe that Dunn, by his conduct in chancery court on March 12–13, did commit acts partaking of criminal contempt. Certainly, the Oklahoma federal court, vested with jurisdiction in a civil suit which Dunn had instituted for his client, had plenary power to act as a court; and that jurisdiction was acquired without fraud, perjury or other corrupt means. In subsequent proceedings brought by government counsel,[32] Dunn was formally charged with criminal contempt, pled not guilty, had a full hearing before the court, and was convicted. Under Mississippi law, Dunn's conviction of criminal contempt is, we think, conclusive that probable cause existed to file the criminal charge and is therefore dispositive of Dunn's case for malicious prosecution. Even if the conviction were given only prima facie effect as to the presence of probable cause, there is nothing to show the conviction was wrongly obtained. Substantial evidence adduced at Dunn's trial is supportive of the charge and conviction of criminal contempt.

hearing is that the state court proceedings proceeds apace. . . ." (p. 287). "[T]his court is certainly at liberty to impose sanctions . . . with respect to the violation of its restraining order in the nature of civil contempt sanctions." (p. 288). The court concluded the hearing by holding both Dunn and Hyde in civil contempt, reserving the matter of assessing damages at a later date. (p. 336).

30. We are, of course, not unmindful that the Fifth Circuit held that the arrest order, based on the underlying papers, was sufficient to entertain criminal contempt proceedings and hence valid as criminal process. See n. 10. Our point simply is that the district judge saw fit to convert a proceeding for civil sanctions into one for criminal contempt, a prerogative basic to judicial authority. Judge Barrow clarified his intentions in the subsequent criminal contempt trial when on August 23, 1966, he stated into the record:

"As to the hearing of the 14th, this still was not a criminal matter. On the 14th it was a show cause why the Court shold not hold him [Dunn] in contempt for not obey-

ing the Court order. He chose not to appear at that hearing also and the Court then, after that, as you know—well, the evidence will show what happened after that." (Tr. 57) . . . "When you have an order to show cause and order to appear, I think that is still civil until he violates it and those are pertinent to the warrant of arrest. The warrant of arrest comes from all these and the defiance of it." (Tr. 61).

31. Brian made an unjustified but quite irrelevant assertion to the court (but only after Judge Barrow had determined to have Dunn arrested) that Dunn had also evinced an intent to flaunt the Fifth Circuit's earlier restraining order. Brian presented this alleged intent "to show a pattern of contemptuousness by this man." Tr. 289. Despite Denny's testimony to this effect (Tr. 334), we find as a fact that Dunn did not disregard or evince an attitude to disregard the restraining order of the Court of Appeals.

32. The charge filed by the U. S. Attorney on July 22, 1966, was listed under a criminal caption and was expressly based on Rule 42(b), F.R.Crim.P., and 18 U.S.C. § 401.

Moreover, our record discloses that after Dunn's conviction was reversed and remanded for Judge Barrow to reconsider in the light of the invalidity of his restraining order, the fact of willful contempt was not erased from the court's mind. The judge decided that Dunn, instead of receiving a punitive sentence, should rectify his defiance by making a series of public speeches on law and order in Mississippi. To this Dunn readily consented and he proceeded to comply. In this manner, Dunn was purged of contempt. After being satisfied with Dunn's rectification, the district judge, "in the interests of justice", dismissed the charge against him. Such a disposition could scarcely be viewed as a termination in favor of the accused. Basic elements for malicious prosecution are, therefore, not present in Dunn's case.

■■■ Dunn mounts his claim for abuse of process upon equally unsubstantial grounds. The only processes issued against Dunn, apart from criminal contempt, were the temporary restraining order, the show-cause order, and the judgment for civil sanctions. Although these civil processes fell with the invalidity of the underlying restraining order, Koehring invoked them at a time when it had reasonable grounds to believe that Dunn was liable for civil sanctions. Further, these civil proceedings were employed by Koehring for precisely the purpose for which they were intended—to coerce Dunn's compliance with a lawful, albeit erroneously issued, court order granted for the protection of Koehring's private interests. Hence, there was no misuse or misapplication of the process so obtained, and Koehring is not to be faulted for the efforts it employed to subject Dunn to civil sanctions.

Dunn also urges that Koehring committed a tort by falsely charging in the Oklahoma federal court, and again on appeals to the Tenth Circuit and the Supreme Court, that Koehring's failure to remove the chancery action to federal court was due to Dunn's representation that he would not require a trial of the state court action. Dunn insists that these assertions were both false and known to be false by Koehring's attorneys, and were recklessly and maliciously made to persuade the federal judiciary in its behalf.[33]

■■■ Credible evidence would support a finding that Dunn made no such misrepresentation and did not mislead Koehring in any manner concerning removal, and also that Koehring's attorneys knowingly made the false charge without an adequate factual basis.[34] Even so, Koehring may not be held liable for the defamatory matter. It is well established that statements made in connection with judicial proceedings, including pleadings, are, if in any way rel-

---

33. Koehring's counterclaim against Hyde in the Oklahoma federal court contained the following allegation:

"On or about September 27, 1961, counsel for plaintiff [Dunn] represented to counsel for defendant [Koehring] that no answer or reply need then be made to the state court complaint because it was filed to try to protect himself in the event that the Federal District Court in Mississippi ruled against him on the question of jurisdiction, and that if the Federal District Court in Mississippi ruled in his favor on the jurisdictional question that he would dismiss the Chancery Court case. Relying on said representations, defendant did not then answer or otherwise move with respect to the action in the Mississippi Chancery Court, and both parties permitted the action to lie dormant." The substance of this charge was repeated in Koehring's appellate briefs.

34. Dunn's only representation was a statement made September 29, 1961, to Koehring's local counsel at Jackson that they would not have to answer or respond to the chancery action until he gave them further notice, which Dunn gave in writing on December 5, 1962. This was confirmed by all who had personal knowledge of Dunn's conversation. Of course, Koehring had long since lost the right of removal to federal court, but its local attorneys then held an opinion that good tactics militated against removal, and they purposely failed to file a petition for removal.

evant to the subject matter of the action, absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood. Gunter v. Reeves, 198 Miss. 31, 21 So.2d 468, 470 (1945); Hardtner v. Salloum, 148 Miss. 346, 114 So. 621, 623–624 (1927).[35] Since Koehring's representations were germane to the ongoing litigation, they provide no cause of action to Dunn for defamation. Additionally, we fail to perceive that factual misstatements, made in judicial proceedings against Hyde, have any nexus with Dunn's individual claim for abuse of process.

Finally, we find equally unpersuasive Dunn's assertion that Koehring's counsel acted improperly in communicating with, and making suggestions of a legal nature to, government counsel regarding his habeas corpus appeal before the Fifth Circuit, his criminal contempt trial at Tulsa, and the appeal of his conviction to the Tenth Circuit. While these matters were in progress, Koehring continued to have at least colorable claims of civil sanctions against Dunn for his contumacious conduct.

Perhaps the strongest evidence that Dunn adduces to establish a desire by Koehring to intermeddle in the criminal processes is the fact that Koehring urged both the U. S. Attorney and Judge Barrow that Dunn be tried with a jury, to support more than a nominal fine in case of conviction.[36] This effort, however, was not only without causative effect, it had no relationship to what occurred since (a) Dunn was brought to trial by the United States Attorney, at the Court's insistence, and not Koehring's; and (b) Dunn was tried to the court, without a jury.[37]

We thus conclude that Dunn has failed to establish liability against Koehring for either malicious prosecution or abuse of process.

## IV. HYDE MUST PREVAIL

Hyde's case stands upon quite a different footing. Koehring's liability for its conduct against Hyde does not arise from the fact that Koehring initially sought to restrain the chancery trial, that it obtained a show-cause order and civil sanctions against its adversary, or that it attempted to uphold those court orders on appeal. Such proceedings, though unsuccessful, were nevertheless taken for a proper purpose, i. e. asserting Koehring's rights as a litigant in good faith. Koehring's actionable misconduct instead sprang from its refusal to abide by adverse rulings by the Court of Appeals for the Tenth Circuit and the Mississippi Supreme Court, both of which were handed down in 1965. Rather than heed the plain import of those decisions, Koehring plunged forward with a spate of patently improper criminal and civil processes against its hapless adversary designed to deprive Hyde of its hard-won judgment.

In July 1965, the Tenth Circuit, although erroneously holding that the Oklahoma federal district court was without transfer jurisdiction, correctly noted that "civil contempt is remedial and accrues to the benefit of the opposing party *who has no claim to reim-*

---

35. Accord: Brown v. Collins, 131 U.S.App. D.C. 68, 402 F.2d 209 (1968); Theiss v. Scherer, 396 F.2d 646, 649 (6 Cir. 1968); Petty v. General Accident Fire & Life Assu. Corp., 365 F.2d 419 (3 Cir. 1966); Ginsburg v. Black, 192 F.2d 823 (7 Cir. 1951); Brown v. Shimabukuro, 73 App.D.C. 194, 118 F.2d 17 (1941).

36. Dunn too wanted a jury trial, but for quite different reasons.

37. Dunn's other contentions, which we reject as legally irrelevant, are (1) that Koehring's criminal and civil processes against Hyde were designed to pressure him personally since he, Dunn, was forced to finance the litigation in view of Hyde's financial problems, and (2) that Koehring was unwilling to consider settlement with Hyde unless Dunn was excluded from sharing in any recovery, although Dunn had no other means of being compensated for legal services to his client.

*bursement for offenses solely against the court. . . .* Thus, the correctness of the contempt orders [entered by Judge Barrow] is dependent upon the jurisdiction of the district court, and the [civil] contempt orders must fall if that court's action were beyond its statutory power." (Emphasis added). 348 F.2d at 648. By this decision Koehring was squarely placed on notice that its claim against Hyde for sanctions in civil contempt was altogether dependent upon the validity of the restraining order, and that if that order violated § 2283, Koehring was uninjured by Hyde's noncompliance. This could not have been misunderstood by Koehring and its attorneys.

In October 1965, the Mississippi Supreme Court handed down another decision adverse to Koehring which, once certiorari was eschewed, could not be ignored. At least three consequences plainly flowed from that ruling. First, the state court's jurisdiction was determined to be concurrent with that of the Oklahoma federal court in an in personam action, despite the prior filing of the federal suit, so that the jurisdiction of the chancery court was not impaired or divested by the restraining order of a federal court. To say the least, this holding, although not controlling upon the Oklahoma federal court, accurately forecast that Judge Barrow's order was improvident.[38] Second, the chancery judgment appealed by Koehring was authoritatively characterized as an in personam decree without effect on any res in the custody of the federal court.[39] Third, assuming jurisdiction, the judgment against Koehring on the merits was final. Koehring knew that it no longer had any basis for relitigating the merits with Hyde and had no right to invoke judicial process for that purpose.

After the state supreme court's decision, the only unresolved question in Hyde's case was whether the Tenth Circuit, after being reversed by the Supreme Court of the United States on the issue of transfer jurisdiction, might nevertheless uphold Judge Barrow's restraining order as an exceptional case under § 2283 and affirm the judgment of civil sanctions against Hyde. This was, at best, a most slender reed upon which to rely—a fact of which Koehring was keenly aware. At that juncture Koehring chose not to accept apparently inevitable defeat, but adopted a course of action which eventuated in the impermissible use of both criminal and civil processes against Hyde.[40] These procedures against Hyde, as incredible as

---

38. The court's opinion on that basic feature of the appeal was a careful analysis of authoritative Supreme Court decisions in Donovan v. City of Dallas, 377 U.S. 408, 84 S. Ct. 1579, 12 L.Ed.2d 409 (1964); Penn. General Cas. Co. v. Commonwealth of Pa., 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850 (1935); and Kline v. Burke Constr. Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922). These decisions were later relied upon by the Tenth Circuit to vacate the district court's restraining order as violative of 28 U.S.C. § 2283. 388 F.2d at 508–509.

39. This ended the confusion which had existed in classifying the effect of Hyde's attachment of Koehring's Mississippi debtor (Dalrymple) in its federal action. The Mississippi Supreme Court stated:

"We have reached the conclusion that the Federal District Court in Oklahoma only had *in rem* jurisdiction over the debt owed by Dalrymple to Koehring. Thus, the Fed-

eral Court could enjoin the attempted proceedings in the Mississippi Chancery Court only insofar as the dual proceedings to affect the *res* as to the Dalrymple debt—allegedly within the jurisdiction of the Federal Court. The Mississippi Chancery Court decree, however, was a personal judgment against Koehring; it in no way affected Dalrymple's debt to Koehring and the *res* held in the jurisdiction of the Federal Court. It appeared, therefore, the Mississippi judgment is not affected by the Federal injunction and prior proceedings in the Federal Court." 178 So.2d at 849.

The Tenth Circuit also concurred in this reasoning. 388 F.2d at 508–509.

40. On October 18, 1965, Denny wrote a Koehring executive officer: "It is still hard to believe that we're almost under final judgment to pay somebody money that we clearly *don't* owe them. . . . It's real as it can be, and *we'll just have to keep*

they are indefensible, extended over a period of more than four years, continuing even beyond the institution of Hyde's present tort action. We shall discuss the criminal process initiated against Hyde before considering the civil procedures.

(a) *Unlawful Resort to Criminal Process*

The record amply sustains our finding that Koehring, concerned about infirmities of the civil sanctions obtained against Hyde, conceived a scheme to invoke criminal process against its adversary for the avowed purpose of offsetting its established liability under the chancery judgment. Remarkably, Koehring at no time stopped to consider whether there was a factual basis to charge Hyde with criminal contempt. Indeed, Koehring has *never* revealed any evidence that Hyde, through its corporate officers, knowingly and willfully defied Judge Barrow's restraining order or shared in the decision to proceed with the chancery trial.[41] Koehring's improper tactic originated in the office of its general counsel;[42] it was communicated to Denny who enthusiastically embraced the idea with the express approval of Messrs. Mertz and Steelman, Koehring's top echelon executives.[43] This stratagem was thereafter implemented and persistently pursued by Martin, under the active supervision of McSweeney and Denny, in the Oklahoma federal court.

The evidence is clear that Martin not only undertook to persuade the U. S. Attorney at Tulsa that criminal contempt proceedings against Hyde were not barred by the one-year statute of limitations (18 U.S.C. §§ 402, 3285); he also submitted an affidavit to commence criminal proceedings against Hyde, had the court issue a notice of hearing for criminal contempt and paid the marshal's fee for service of process. Indisputably, Koehring on April 7, 1966, initiated criminal process against Hyde for private gain.[44] Although this proceed-

---

*doing all we can to set it aside or nullify its effect."* (Emphasis added). (Plt. Ex. 146)

41. It is uncontradicted that Dunn, as he has candidly acknowledged, ignored the restraining order without consulting his client's wishes and thus was solely responsible for the willful defiance.

42. On November 5, 1965, McSweeney counselled Denny that "[T]he whole key to whether this tactic can be successful is in the presentation to the judge . . . [Martin] might at the same time suggest that perhaps by oversight the court had not cited Hyde and its assignees. In addition, he might remind the court that criminal contempt would not have whatever infirmities the civil might have. Finally, he [Martin] might suggest that the same remedy given in a civil contempt action might be appropriate in a criminal contempt as punishment." (Plt. Ex. 41)

43. On November 15, 1965, Denny advised Martin: "[T]here is good authority *for the Court ordering Hyde Construction Company to pay to Koehring as a fine for criminal contempt an amount at least equal to any amount Koehring would be obligated to pay Hyde under the Mississippi judgment* . . . It is even most sincerely hoped you'll be able to convince the U. S. Attorney

that such action against Hyde Construction Company would be the most effective way *for assuring maintenance of the status quo which was restored by Judge Barrow's September 1, 1964 order based on civil contempt.* We are very hopeful that the long pendency of our Petition for Certiorari [from the Tenth Circuit's ruling against transfer jurisdiction] will lead to a ruling that Judge Barrow did have jurisdiction for citing for civil contempt. However, should it not, *it would sure make sense to be going forward along the criminal contempt route before the Supreme Court tells us we're at the end of the civil contempt route."* (Emphasis added). (Plt. Ex. 43)

44. In his deposition, Denny testified (p. 53–54):
"Q. What moved you to want to see the corporation [Hyde] convicted and fined of criminal contempt?
A. The lawyers—our outside counsel—had done some research and came up with the theory that one way Judge Barrow could prevent the possibility of this development [having to pay the judgment to allegedly insolvent Hyde] was to hold a criminal contempt hearing with respect to the corporation, and, if he found them to be in criminal contempt, could do certain things. One of which would be to fine the corporation an

ing was halted pending appeal, Koehring was unrelenting in its efforts to recoup its losses by use of criminal process. Koehring's efforts were intensified after the Tenth Circuit, in January 1968, swept aside all outstanding orders and civil sanctions against Hyde. Koehring then brazenly intervened in the criminal action, obtained a showcause order to temporarily restrain Hyde from collecting its judgment, and tendered into court the full amount of the chancery judgment ($507,000) in the hope that the court might award to it a portion, if not all, of any monetary fine imposed against Hyde for criminal contempt. At the May 21, 1968, hearing for criminal contempt, Koehring, almost three years after the Tenth Circuit had held to the contrary, maintained that Koehring was interested as an injured party in the criminal contempt and might be the recipient of a punitive fine.[45]

Judge Barrow wisely resisted Koehring's tactic; he ordered a return of the money to Koehring and declined to take

action against Hyde at that time. Although no subsequent hearing was ever held nor any evidence presented against Hyde that it was guilty of criminal contempt, Koehring nevertheless did not abandon hope, for until the criminal action against Hyde was finally dismissed a year later, Koehring maintained a lively interest in an allocation of any fine against Hyde.[46]

(b) *Improper Use of Civil Processes*

In addition to its ploy for criminal contempt, Koehring embarked upon a parade of abusive civil processes against Hyde. These proceedings also began early in 1966 when Koehring, notwithstanding the incontrovertible finality of the Mississippi Supreme Court's decision on the merits, resumed efforts in the Oklahoma federal court to relitigate, by way of counterclaim, the breach of contract action by filing interrogatories and taking depositions. Hyde's plea of res judicata being overruled in the district court, Koehring's attempt to relitigate was halted only by the stay of the Tenth

---

amount equal to the judgment it obtained in violation of Judge Barrow's order, *that this would sort of neutralize things and that we would then be back to where we were before Judge Barrow's order had been violated."* (Emphasis added).

Martin also testified as to the motive for initiating the criminal action against Hyde:

"At this stage of the game, it appeared to be that the criminal contempt was *one of the few strings left in the bow,* and I felt then and feel now that *it was a proper attempt to extract from Hyde what they had gotten by their action through Judge Stennett."* (Emphasis added) (Martin's dep. 39–40).

45. McSweeney, in an interesting "two-hat soliloquy", advised the court:

"We are here as citizens of the United States and also as counsel for Koehring Company, and we are here as disinterested parties in the sense that we are citizens of the United States and we are also here as interested parties in the sense that we are attorneys for Koehring Company, and Koehring Company certainly does consider itself an aggrieved party here, and that they have been injured by the criminal contempt if it should be held that there is a criminal contempt. [Tr. 39c] . . . Well, we are

here with two hats, your Honor. We are here with the hat of the Koehring Company. We are here with the hat of the United States citizen." [Tr. 39f] The U. S. Attorney agreed that Koehring "is monitoring this case from the wings and . . . is a really interested party if not the real party in interest." (Pltf. Ex. 76).

46. On January 21, 1969, Denny wrote Martin: "Things begin to look blacker and blacker in the Hyde litigation. . . . If you have any notion as to how soon Judge Barrow is going to set a hearing in the criminal contempt matter, please let us hear from you." (Plt. Ex. 78)

On February 17, 1969, Denny wrote Martin: "If Judge Barrow is ever going to do anything about the criminal contempt case against the corporation, I sure hope he does it before we are wound up in the Seventh Circuit [in the interpleader action filed at Milwaukee]." (Plt. Ex. 81)

McSweeney's tactic terminates April 11, 1969, when he wrote to Koehring's local counsel at Jackson: "We verified that the criminal contempt over in Oklahoma was dismissed. It appears that this is the time to get Koehring out if we can protect them." (Plt. Ex. 83)

Circuit, which subsequently remanded the plea of res judicata to the district court for consideration.[47] Upon remand Koehring abandoned its counterclaims against Hyde in the Oklahoma federal court and continued its vexatious and harassing litigation in yet another forum.

When Hyde commenced long-delayed Mississippi proceedings to collect on its aging judgment, Koehring feigned exposure to Hyde's creditors who were themselves demanding payment of the judgment. Astonishingly, Koehring sued Hyde again, invoking the interpleader jurisdiction of the Wisconsin federal court, into which it paid the amount of the chancery judgment and obtained, ex parte, an order restraining Hyde from executing upon its judgment.[48] The Seventh Circuit's characterization of Koehring's procedure in the Wisconsin federal court as "ill-founded if not a sham," was entirely accurate, for, as pointed out by the Seventh Circuit, all Koehring had to do, to obtain valid discharge from the judgment, was either to invoke Mississippi statutes providing for interpleader in garnishment proceedings or to pay the judgment to the sheriff of Hinds County, Mississippi, upon the execution, with notice to him of diverse claims to the judgment proceeds. By no stretch of the imagination could Koehring's own claim to the interpleaded funds be dignified as even colorable.

Even so, Koehring vigorously pursued to the end its spurious interpleader action in the Wisconsin federal court, exhausting all appeals.

In the interim—even after Hyde's present tort action was filed—Koehring returned to Mississippi to challenge the receivership created by Hyde's creditors in Hinds County Chancery Court, without apparent purpose other than to frustrate those proceedings. Persevering in this useless and vexatious litigation, Koehring appealed to the state supreme court from adverse rulings, ceasing further resistance only after the Seventh Circuit had peremptorily chastised Koehring for needlessly suing Hyde in the Wisconsin interpleader action.

In summary, it is clear that for four years Koehring did conduct a wholly unjustifiable campaign to frustrate the collection of a lawfully entered judgment. Each of the improper judicial proceedings which combine into Koehring's master plan—most notably the criminal contempt against Hyde, the Wisconsin interpleader, the receivership opposition—was deliberately and maliciously invoked against Hyde for purposes wholly incompatible with their lawful function, to serve Koehring's ulterior purposes as it strove to gain collateral advantage beyond the lawful scope of those processes. Each judicial proceeding initiated by Koehring was prosecuted with clearly demonstrated

---

47. Hyde Constr. Co. v. Koehring Co., 388 F. 2d at 511:

"Hyde urges us to order the dismissal of the case on the ground of res judicata. We decline to do so. The case is here on the sole issue of the propriety of the denial of the motion to dissolve the injunction. Our decision on res judicata is limited to the application of that principle to the question of the jurisdiction of the Mississippi courts to proceed with the state trial. The merits are not before us. The plea of the application of the bar of res judicata to the merits, and all other questions pertaining to the merits of the controversy, must be decided by the district court in the first instance."

48. Koehring's petition in the nature of a bill of interpleader filed on May 27, 1968, was motivated, in part at least, by the vain hope that the Oklahoma federal court might ultimately award it a portion of any punitive fine assessed against Hyde in the criminal contempt proceeding. Koehring's petition, ¶ 11, recited:

"[Koehring] may have an offset against the judgment if the United States District Court for the Northern District of Oklahoma should enter a fine in certain related criminal contempt proceedings presently pending in that court against Hyde Construction Company, Inc., and should the fine be made payable to Koehring, and may have additional offsets as yet undetermined." (Plt. Ex. 74)

malice, without probable cause, and terminated unsuccessfully, with resulting damage to Hyde. Koehring surely may not disclaim responsibility for the acts of its agent-attorneys, for it is unassailably clear that Koehring's chief executive officials knowingly consented to, and unhesitatingly financed, the entire campaign.

We thus hold that the criminal and civil procedures which Koehring invoked against Hyde—from 1966 forward—clearly render Koehring liable in tort. As we perceive the record, these improper procedures, when viewed in their totality and measured by Mississippi's jurisprudence, make Koehring culpable of both abuse of process and malicious prosecution. Koehring's resort to judicial processes as a club or form of extortion constitutes abuse of process, while Koehring's initiation of the several judicial proceedings against Hyde, most spectacularly the charge of criminal contempt, satisfies the elements essential to malicious prosecution. We turn therefore to a consideration of the damages proximately caused to Hyde by Koehring's wrongful acts.

Hyde expressly limits its claim for compensatory damages to losses it sustained for legal fees and related expenses incurred in litigation collateral to the original breach of contract action, a stipulated total of $242,005.79. See note 14, supra.[49] It would plainly be inequitable, however, to charge Koehring with Hyde's entire expenses for all collateral proceedings, since a substantial portion of those expenses occurred before Koehring began its tortious conduct. Some reasonable apportionment is therefore required.

The collateral litigation began in March 1964 with Koehring's initial appearance in the Oklahoma district court, and ended almost precisely six years later, on March 25, 1970, when Koehring paid the judgment to Hyde's chancery receiver. During this 6-year odyssey, the Hyde-Koehring litigation was ongoing and perpetual, requiring, we believe, a relatively constant expenditure for legal services throughout the entire period. The case records provide an adequate factual basis for this view. Accepting this as a reasonable premise, we may conclude that Hyde incurred Koehring-related legal costs at an average annual rate of $40,334.30 ($242,005.79 ÷ 6 years).

Also, during the period under consideration, it is indisputable that Koehring was legally faultless for the first two years. Indeed, the stream of tortious conduct for which Koehring must now be brought to account began on April 7, 1966, with the institution of criminal contempt proceedings against Hyde, and continued unremittingly for the next four years, until the March 25, 1970, final payment.

■ The compensable damages suffered by Hyde, then, and for which Koehring must bear full responsibility, consist of 4 years of unnecessary legal costs totaling $161,337.20. An award of this amount validly measures Koehring's culpability and adequately compensates Hyde for its only provable losses.

Justice requires, however, that we exercise discretion to award exemplary damages against Koehring, as punishment for wanton and willful misconduct. Roberts v. Pierce, 398 F.2d 954 (5 Cir. 1968); Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F.Supp. 1176, 1200 (N.D.Miss.1970). For although the courts of this nation, both state and federal, should ever be available to all who may have grievances, real or fancied, nevertheless judicial processes cannot be used as a shield for anyone, in the guise of a litigant, to act irresponsibly and capriciously, in reckless disregard of the rights of others. The principal factors which here guide us in fixing punitive damages are: (1) Koehring's contumacious and intentionally tortious activity for a protracted pe-

---

49. Hyde offered no proof that it sustained other elements of actual damage as a result of Koehring's litigation.

riod of time; (2) the massive financial resources of the tortfeasor; and (3) the substantial expense of legal services rendered by Hyde's counsel in the present action in their prodigious efforts to vindicate its rights against Koehring. With these considerations in mind, we assess punitive damages in the sum of $200,000.00. Koehring's total damages to Hyde are therefore fixed at $361,337.-20.

Let orders be issued accordingly.